**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150, AFL-CIO, | ) | |
| | ) | No. 23 C 15257 |
| *Plaintiff* | ) | |
| v. | ) | Chief Judge Virginia M. Kendall |
| | ) | |
| BARRINGTON EXCAVATING, LLC | ) | |
| | ) | |
| *Defendant.* | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff/Counter-Defendant International Union of Operating Engineers, Local 150, AFL-CIO ("Local 150") brings this action against Defendant/Counter-Claimant Barrington Excavating, LLC ("Barrington") under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 *et seq*. (Dkt. 1). Local 150 seeks to enforce and collect two awards decided by a Joint Grievance Committee for a total of $182,288.27. (*Id.*). Barrington asserts that the awards are invalid and should be vacated. (Dkt. 87). Both parties have moved for summary judgment. (Dkt. 118); (Dkt. 122). For the reasons set forth below, Local 150's Motion for Summary Judgment [118] is denied and Barrington's Motion for Summary Judgment [122] is granted in part and denied in part.

**BACKGROUND**

## I. Compliance with Local Rule 56.1

"On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Pursley v. City of Rockford*, 2024 WL 1050242, at *1 (N.D. Ill. Mar. 11, 2024); *see also* L.R. 56.1. The Court has discretion to require strict compliance with Local Rule 56.1 or overlook the parties' transgressions. *See Allen-Noll v.*

*Madison Area Tech. Coll.*, 969 F.3d 343, 349 (7th Cir. 2020); *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011) (quoting *Litte v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995)).

Both parties violated both the letter and the spirit of Local Rule 56.1. Most notably, their factual submissions are unnecessarily long. Although the Court permitted the parties to file statements containing up to 120 numbered paragraphs—well above the 80 paragraphs ordinarily permitted under Local Rule 56.1(d)(5)—and limited those filings to 25 pages, neither party complied with those requirements. (Dkt. 117); L.R. 56.1(d)(5). Local 150 technically complied with the paragraph limit by submitting 119 numbered paragraphs, but many of those paragraphs improperly combine multiple factual assertions rather than presenting the "concise numbered paragraphs" required by Rule 56.1(d)(1). (Dkt. 121). Its statement also spans 50 pages—twice the page limit imposed by the Court. (Dkt. 121); (Dkt. 117). Barrington committed similar violations. Its statement of additional facts exceeds the number of paragraphs permitted by Rule 56.1(d)(5). (Dkt. 136-1). Despite committing comparable violations, Local 150 nevertheless asks the Court to strike Barrington's factual submissions as excessive. (Dkt. 139 at 47-53).

The parties compounded these procedural deficiencies by using their Rule 56.1 filings to advance legal arguments rather than identify material facts. For example, Local 150 repeatedly attributes conduct by both Barrington and Sinnett Excavating, Inc. to "Defendant," reflecting its legal theory that the two companies are one and the same. (*See generally* Dkt. 121). Barrington likewise uses its factual statements to assert its legal position regarding the existence, or absence, of a contractual relationship with Local 150, which lies at the center of this dispute. (*See, e.g.*, Dkt. 123 ¶¶ 16, 45, 64-65, 99; Dkt. 136-1 ¶¶ 33-34, 38). The parties continue these arguments throughout their Rule 56.1 responses and replies. (Dkts. 135, 137, 139). Legal arguments belong in summary judgment briefs, not Rule 56.1 filings. *See Judson Atkinson Candies, Inc. v. Latini-*

*Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008); L.R. 56.1(d)(4), (e)(2). Accordingly, the Court disregards the portions of the parties' Rule 56.1 filings that assert legal conclusions or arguments rather than facts. *See Beijing Choice Elec. Tech. Co. v. Contec Med. Sys. USA Inc.*, 2024 WL 6862218, at *1 (N.D. Ill. Sept. 30, 2024).

The parties' responses fare no better. Rather than narrowing the factual disputes, each side objects to virtually every statement submitted by the other. (Dkts. 135, 137, 139). Many of these objections lack merit, focus on immaterial facts, contain improper arguments, or are inadequately supported. (Dkt. 135); (Dkt. 137); (Dkt. 139). Local 150's responses are particularly problematic. Most objections span multiple pages and are replete with unnecessary or improper information. (*See e.g.,* Dkt. 135 at 4-6, 8-10, 36-38; Dkt. 139 at 4-7, 13-15, 20-26). Even when it admits a fact, it proceeds to give additional, extraneous information. (*See, e.g.,* Dkt. 125 at 27, 40, 69, 71); (Dkt. 139 at 9, 15, 17, 32). Barrington, in turn, often disputes or denies asserted facts without adequate citations to the record. (*See, e.g.,* Dkt. 137 at 6-7, 19, 24, 37).

Rule 56.1 exists to "make summary-judgment decisionmaking manageable for courts." *Kreg Therapeutics, Inc. v. VitalGlo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019). By disregarding the Rule's requirements, the parties have frustrated that purpose and created the sort of "sea of paper" that "wastes both the Court's time and the clients' resources." *Bixby v. JP Morgan Chase Bank, N.A.*, 2012 WL 832889, at *2 (N.D. Ill. Mar. 8, 2012); *see also Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty., Illinois*, 424 F.3d 659, 664, n.2 (7th Cir. 2005) ("[I]t is not the duty of the district court to scour the record in search of material factual disputes. . . ."); *Wilbern v. Culver Franchising Sys., Inc.*, 2015 WL 5722825, at *17 (N.D. Ill. Sept. 29, 2015) (finding that the parties violated "the letter and spirit" of Rule 56.1 "most egregiously by bombarding the Court with factual and legal arguments that are outside the purpose of Rule 56.1 statement"). Local 150's conduct is

especially troublesome given that this is not the first time the Court has admonished it for violating the Local Rules. *See Dore & Assocs. Contracting, Inc. v. Int'l Union of Operating Eng'rs, Loc. Union No. 150*, 2017 WL 3581159, at *1-2 (N.D. Ill. Aug. 18, 2017). It would take pages to evaluate and address each party's misdoings, further frustrating Rule 56.1's intended goal of efficient resolution. Because the parties' noncompliance does not prevent the Court from resolving the pending Motions, however, the Court declines to strike either side's Rule 56.1 submissions. Instead, the Court considers only those factual assertions that are properly supported by the record and material to the issues presented. Any objections relevant to material facts on which the Court relies are resolved in footnotes.

## II. Facts

Consistent with the discussion above, the following facts are undisputed unless otherwise noted. The Court includes only those facts that are relevant to its analysis. Sinnett Excavating, Inc. ("Sinnett Excavating"), was incorporated in 1984 by Scott Sinnett I ("Sinnett I"). (Dkt. 123 ¶ 3). Sinnett Excavating performed excavating work, grading work, and demolitions. (Dkt. 121 ¶ 18). The Sinnett family has been in the excavating business for decades; Sinnett I's father, Melvin Sinnett ("Sinnett Sr.") previously owned and operated Sinnett Excavating Co. (*Id.* ¶ 4). Local 150 is a labor organization under the National Labor Relations Act ("NLRA"). (*Id.* ¶ 3).

On August 18, 1995, Local 150 and Sinnett Excavating signed a memorandum of agreement ("MOA") that adopted a collective bargaining agreement ("CBA" or "Agreement") between Local 150 and the Mid-American Regional Bargaining Association ("MARBA"), otherwise known as the Illinois Heavy, Highway and Underground Agreement[1]. (*Id.* ¶ 5); (Dkt.

[1] In the 1960s, Sinnett Excavating Co. ("SEC") and Local 150 executed a similar MOA adopting an earlier version of the CBA. (Dkt. 121 4). Local 150 later sued Sinnet Excavating to enforce awards it obtained against Sinnet Excavating for alleged violations of the CBA. *Int'l Union of Operating Eng'rs, Loc. 150, AFL-CIO v. Sinnett Excavating, Inc.*, 1995 WL 23040 (N.D. Ill. Jan. 19, 1995). The parties disputed whether Sinnet Excavating was bound to the MOA

123 ¶ 11); (Ex. 15, Dkt. 125-3 at 5). The MOA also adopted the terms of successive CBAs. (*Id.*). By signing the MOA, Sinnett Excavating recognized Local 150 as the "sole and exclusive bargaining representative for and on behalf of" its employees. (Ex. 15, Dkt. 125-3 at 5). The MOA bound Sinnett Excavating, its successors, and assignees to the CBA and stated that it would "continue in effect from year to year . . . unless notice of termination or amendment is given in the manner provided herein." (*Id.*). The MOA required either party to give the other three months' notice of its intent to terminate the MOA. (*Id.*). There was no requirement to provide any reasons for choosing to terminate the MOA. (*Id.*); (Dkt. 123 ¶ 23). Following the 1995 CBA, Local 150 and MARBA negotiated three successive, nearly-identical agreements: CBA I was in effect from June 1, 2017 to May 31, 2021; CBA II was in effect from June 1, 2021 to May 31, 2024, and CBA III, which was executed on May 31, 2024, is in effect until June 1, 2027. (Dkt. 123 ¶¶ 17, 29, 33); (Ex. 6, Dkt. 123-6); (Ex. 10, Dkt. 123-9); (Ex. 11, Dkt. 123-10).

Sinnett I became ill in 2021. (Dkt. 123 ¶ 4). On February 5, 2021, he informed Local 150 via letter that he was retiring from his business and the Union and closing Sinnett Excavating, effective May 31, 2021. (Dkt. 121 ¶ 25); (Dkt. 123 ¶ 18); (Ex. 8, Dkt. 123-7). He also told Local 150 that, in light of his retirement and pursuant to the MOA's notification requirement, Sinnett Excavating was terminating its MOA with the Union, effective May 31, 2021, and withdrawing from further participation in subsequent CBAs upon termination of CBA I. (*Id.*). On February 19, 2021, Dale Pierson, General Counsel for Local 150, responded to Sinnett I on behalf of Local 150. (Dkt. 121 ¶ 25); (Dkt. 123 ¶ 20); (Ex. 9, Dkt. 123-8). Pierson explained that, ordinarily, Sinnett Excavating would have to honor the terms of CBA I through its expiration on May 31, 2021 and any successor CBA negotiated by MARBA. (Ex. 9, Dkt. 123-8). Pierson informed Sinnett I that,

---

executed by SEC. *Id.* at *2. The Court denied the parties' cross-motions for summary judgment, holding that factual disputes prevented it from deciding whether Sinnet Excavating was a successor in liability to SEC. *Id.* at *4-5.

because he was retiring and going out of business, he was not required to negotiate a new memorandum of agreement with Local 150. (*Id.*). Sinnett Excavating dissolved as an Illinois corporation on May 28, 2021. (Dkt. 121 ¶ 28); (Dkt. 123 ¶ 4). Sinnett I retired on May 31, 2021. (Dkt. 123 ¶ 4); (Ex. 18, Dkt. 125-6 at 2).

Sinnett I's son, Scott Sinnett II ("Sinnett II") incorporated Barrington Excavating, LLC on June 14, 2021[2]. (Dkt. 121 ¶ 28); (Dkt. 123 ¶ 5); (Ex. 17, Dkt. 125-5). Barrington also performs excavating, demolition, and grading work. (Dkt. 121-12, Tr. 81:23-82:14). Sinnet II chose to start Barrington instead of continuing Sinnett Excavating because he wanted to have his own company and because he did not want to pay union dues, which he was worried he could not afford. (*Id.* at 96:14-97:12, 100:3-6; 133:8-9, 134:23-135:1). Sinnett I has never worked for Barrington, managed its business, or supervised its employees[3]. (Dkt. 123 ¶ 7). There is no agreement with Local 150 that names Barrington or is signed by Barrington. (*Id.* ¶ 64); (Dkt. 123-11, Ex. 7, Tr. 19:8-10).

Barrington operates out of the same facilities previously used by Sinnett Excavating at 27W929 Commercial Avenue, Barrington, Illinois. (Dkt. 121 ¶ 28); (Ex. 15, Dkt. 125-3 at 5); (Ex. 17, Dkt. 125-5). Sinnett I and his wife own the property. (Dkt. 121 ¶¶ 6, 69). Sinnett II rents the facilities from his parents on behalf of Barrington. (*Id.* at ¶ 69). Additionally, Barrington purchased almost all of Sinnett Excavating's equipment. (*Id.* at ¶ 74). Sinnett II removed Sinnett Excavating's name from some of the equipment but has not repainted all of it. (*Id.* at ¶ 84).

**A. The Collective Bargaining Agreement**

The CBA adopted through the MOA between Sinnett Excavating and Local 150 governs

[2] Sinnett II told a Barrington Chamber of Commerce representative that he started Barrington in May 2021. (Dkt. 121-10 at 259). Nevertheless, it is undisputed that Barrington was not incorporated until June 24, 2021. (Dkt. 125 at 3-6).
[3] Local 150 Business Representative Brian Palka testified that he saw Sinnett I "escorting a vehicle" owned by Barrington on one occasion. (Dkt. 121-13, Tr. 219:1-222:24). Local 150 does not, however, dispute that Sinnett I was never employed by Barrington. (Dkt. 135 at 6-7).

the respective rights and obligations of Local 150 and employers and sets employee wages, hours, working conditions, and other terms of employment. (Ex. 6, Dkt. 123-6 at 3-8)[4]. It also requires employers to assign all work to bargaining unit members and obtain employees through Local 150. (Dkt. 121 ¶ 40-41); (Ex. 6, Dkt. 123-6 at 13, 40). Under Article I, Section 10A and 10B, the CBA is binding on the employer's successors, and the employer is required to notify Local 150 if it changes its name or ownership, terminates, or dissolves. (Dkt. 121 ¶ 39); (Ex. 6, Dkt. 123-6 at 12-13).

The CBA also provides a multi-step procedure to resolve grievances between an employer and Local 150. (Dkt. 121 ¶¶ 42-43); (Dkt. 123-6 at 40-43). It defines a grievance as "any claim or dispute involving an interpretation or application of the Agreement" by an employee, employer, or Local 150. (Dkt. 123-6 at 40-41). At Step One, the grievance must be "taken up" between a Local 150 representative and a representative of the employer within 45 days of the occurrence giving rise to the grievance or when the affected employee knew or should have known of the existence of the grievance. (*Id.* at 41). If the grievance is not resolved within seven days of the Step One conference, Step Two requires the parties to reduce the grievance to writing and conduct a conference between officials from Local 150 and the employer. (*Id.*). If the dispute remains unresolved, the parties must proceed to Step Three and submit the written grievance to the Joint Grievance Committee ("JGC" or "Committee") for resolution within fifteen days. (*Id.* at 41-42); (Dkt. 123 ¶ 25). Under Step Four, the grievance may be submitted to a neutral arbitrator within 30 days if the JGC cannot reach a resolution. (Dkt. 123-6 at 42).

The JGC has "the power to resolve all grievances before it." (Dkt. 123-6 at 41). It can "decide questions of both procedural and substantive arbitrability" and determine and assess

[4] For efficiency, and because the successive Agreements are largely identical, the Court cites to CBA I for general descriptions of the Agreement.

remedies for violations of the CBA. (*Id.* at 41-42). The JGC cannot, however, "add to, detract from, or in any way alter the provisions" of the CBA or make a new Agreement. (*Id.* at 43); (Dkt. 123 ¶ 27).

**B. The Grievances**

Between June 2021 and April 2023, Brian Palka, a Business Representative for Local 150, monitored and took pictures of Barrington's equipment, facility, and operations at various worksites within Local 150's jurisdiction. (Dkt. 121 ¶ 45); (Dkt. 123 ¶ 39); (Ex. 12, Dkt. 124-1); (Ex. 19, Dkt. 125, Tr. 180:1-183:1). Based on his observations, Palka believed that Sinnett Excavating was still operating under the Barrington name because Barrington worked in the same facilities and used equipment bearing the "Sinnett" name. (Ex. 19, Dkt. 125, Tr. 180:12-15, 182:4-17). On March 3, 2023, Palka observed Barrington using non-bargaining-unit employees to perform work covered by the CBA at a site in Lake Zurich, Illinois, which he believed constituted a violation of the CBA because he understood Barrington to be Sinnett Excavating operating under a new name. (Dkt. 123 ¶ 45); (Ex. 19, Dkt. 125, Tr. 64:18-24, 93:11-21).

Pursuant to Step One of the grievance procedure, Palka conferred with Sinnett II about the alleged violation and informed him that he would be filing a grievance with Local 150. (Dkt. 121 ¶ 45); (Dkt. 121-10 at 65); (Ex. 19, Dkt. 125, Tr. 89:5-17). According to Palka, Sinnett II's response to the allegations was "I bought everything from my dad." (Dkt. 121-10 at 65). On March 3, 2023, pursuant to Step Two of the grievance procedure, Local 150 filed a grievance ("Grievance 23-3-003") and sent it via email to barringtonexcavatingllc@gmail.com and via mail to 27W929 Commercial Avenue, Barrington, Illinois 60010. (Dkt. 121 ¶ 46); (Dkt. 121-10 at 46-51).

Grievance 23-3-003 is addressed to "Mr. Scott Sinnett, President" at "Sinnett Excavating, Inc." (Dkt. 121-10 at 46). It charges Sinnett Excavating with failing to obtain employees through

Local 150's referral offices, performing work with non-bargaining unit employees, and failing to execute "the proper documentation and follow the proper procedures set forth in Article I, Section 10A and 10B" of the CBA. (*Id.*). The grievance letter includes Palka's statement to Local 150, which summarizes the violations as: "Came across Sinnett Excavating AKA (Barrington Excavating) in Lake Zurich running 2 skid steers and an excavator with 2 non-members." (*Id.* at 48). Finally, the grievance estimated Sinnett Excavating's damages at $2,401.69, noting that they were ongoing. (*Id.* at 46). Local 150 also notified Sinnett Excavating that it scheduled a meeting on March 21, 2023 for the parties to resolve the dispute and that the matter would be referred to the JGC if it was not resolved at the meeting. (*Id.* at 46-47).

On March 20, 2023, attorney James Harrison responded to Grievance 23-3-003 on behalf of Sinnett I. (Dkt. 123 ¶ 43); (Ex. 18, Dkt. 125-6). He stated that Local 150's allegations that Sinnett I and Sinnett Excavating violated the CBA were false because, as Local 150 acknowledged, Sinnett I dissolved Sinnett Excavating on May 31, 2021 after he retired. (Ex. 18, Dkt. 125-6 at 2-4). As such, Local 150 had no "contractual jurisdiction" over Sinnett I or Sinnett Excavating as of May 31, 2021. (*Id.* at 3-4). He further stated that Barrington was not a successor employer to Sinnett Excavating, so Local 150 should defer to Sinnett II should they have an issue with Barrington. (*Id.* at 4). He advised Local 150 that neither he nor Sinnett I would be attending the scheduled meeting because Sinnett I was dealing with a serious health condition and the meeting was based on a terminated contractual relationship. (*Id.* at 4).

Local 150 filed two more grievances on April 17, 2023 ("Grievance 23-3-006") and December 21, 2023 ("Grievance 23-3-057"). (Dkt. 121-10 at 121-125); (Ex. 15, Dkt. 125-3 at 14-17). Both were addressed to "Mr. Scott Sinnett, President" at "Sinnett Excavating, Inc." and sent to the same mailing address and email address as the first grievance. (Dkt. 121-10 at 121); (Ex. 15,

Dkt. 125-3 at 14). Grievance 23-3-006 charged Sinnett Excavating with "wrongfully terminat[ing] the collective bargaining agreement." (Dkt. 121-10 at 123). As relief, Local 150 requested that Sinnett Excavating recognize Local 150 and abide by "the contract." (*Id.*).

Grievance 23-3-057 charged Sinnett Excavating with violating CBA I on December 8, 2025 at a construction site in Wauconda, Illinois by failing to obtain employees through Local 150's referral offices and performing work with non-bargaining employees. (Ex. 15, Dkt. 125-3 at 14). It stated that Palka "found Scott Sinnett, II running a Lowboy with a roller on deck" and witnessed "Scott Sinnett operating Skidsteers as well as Rollers." (*Id.* at 16). As relief, Local 150 sought wages and fringe benefits equal to $3,208.96. (*Id.*). As with the first grievance, Local 150 set meetings to attempt resolution before referring the matters to the JGC. (Dkt. 121-10 at 121); (Ex. 15, Dkt. 125-3 at 14). On May 15, 2023, Harrison responded to Grievance 23-3-006 on behalf of Sinnett I and Sinnett Excavating, repeating his positions from his previous letter and informing Local 150 that Sinnett I was medically unable to attend the scheduled meeting, but, regardless, would not attend because he had no contractual obligations to Local 150. (Ex. 18, Dkt. 125-6 at 6-8).

**C. The Initial JGC Hearings and Awards**

On May 22, 2023, pursuant to Step Three of the grievance procedure, Local 150 sent notices to Harrison and "Mr. Scott Sinnett" of a JGC hearing scheduled for June 7, 2023 regarding Grievances 23-3-003 and 23-3-006. (Dkt. 121-10 at 37); (Ex. 16, Dkt. 125-4 at 4-7). Harrison informed Local 150, on behalf of Sinnett I and Sinnett Excavating, Inc., that Sinnett I would not attend the hearing, repeating the same positions he put forth in his previous communications. (Dkt. 121-10 at 24-26).

On June 7, 2023, Palka presented Grievances 23-3-003 and 23-3-006 to the JGC. (Dkt. 121

¶ 54); (Dkt. 135 at 42). Neither Sinnett I, Sinnett II, nor anyone else from Sinnett Excavating or Barrington attended. (Dkt. 121 ¶ 54). During the hearing, Palka informed the JGC of Barrington's existence and argued that Sinnett Excavating still operated under Barrington's name and that Sinnett I's 2021 notice of termination was "sent in under false pretenses and the business was not going out of business but changing their name." (Dkt. 121-13, Tr. 76:22-77:8, 128:4-7). As evidence, he offered pictures of property and vehicles under the Sinnett name, articles about Sinnett II taking over "the family business," and other documents that showed "nothing changed except Scott Sinnett II taking over the business." (*Id.* at 77:9-22).

The JGC issued its decisions ("JGC Awards") on the same day. (Ex. 20, Dkt. 125-8). The Awards found that Sinnett Excavating was party to CBA I and violated the Agreement. (*Id.* at 2-3). For Grievance 23-3-003, the JGC ordered Sinnett Excavating to pay $165,716.61 to the Local 150 Scholarship Fund. (*Id.* at 2). The JGC did not assign any monetary damages for Grievance 23-3-006. (Ex. 20, Dkt. 125-8 at 3). It did, however, include a statement that "Agreement is in full force and effect per Article I, Section 10 A of the Collective Bargaining Agreement." (*Id.*).

Union Chairman Stan Simrayh, who sat on the JGC for the hearing, testified that he determined that Sinnett I did not retire, his termination of CBA I was "fraudulent," and that Sinnett Excavating did not go out of business but was passed on to Sinnett II. (Dkt. 123 ¶ 53); (Dkt 121-11, Tr. 74:16-21). He described this as a "clear case of successor assigns covered by the collective bargaining agreement." (Dkt 121-11, Tr. 75:7-11). Nevertheless, neither decision references Barrington, makes any findings as to Barrington's relationship with Sinnett Excavating, or discusses Sinnett Excavating's termination of the MOA. (Ex. 20, Dkt. 125-8 at 1-4).

The same day they were issued, Local 150 sent the JGC Awards, which were addressed to "Mr. Scott Sinnett" at "Sinnett Excavating LLC," by mail to the Commercial Avenue address and

by email to Harrison and barringtonexcavatingllc@gmail.com[5]. (Dkt. 121 ¶ 56); (Dkt. 1-1 at 169-70); (Dkt. 121-10 at 18). On October 9, 2023, Local 150 sent a follow-up letter requesting payment of $182,288.27 relating to Grievance 23-3-303. (Dkt. 121-10 at 14). On February 7, 2024, the JGC issued a decision on Grievance 23-3-057, finding that Sinnett Excavating was party to the CBA and violated the Agreement and ordering Sinnett Excavating to pay $3,208.96 to the scholarship fund. (Ex. 20, Dkt. 125-8 at 4). Local 150 has not sought to enforce this award. (Dkt. 123 ¶ 52).

### D. Judicial Proceedings and Supplemental JGC Awards

On October 24, 2023, Local 150 filed the Complaint against "Barrington Excavating, LLC, f/k/a Sinnett Excavating, Inc." seeking to enforce the JGC Awards for Grievances 23-3-003 and 23-3-006 against Barrington and asking the Court to find "the parties' CBA in full force and effect." (Dkt. 1). Barrington moved to dismiss the Complaint, arguing that it was not a party to the CBA or the JGC proceedings and that Local 150 improperly sought damages in excess of the JGC damages cap. (Dkt. 12). The Court denied Barrington's motion. (Dkt. 32).

On September 19, 2024, Barrington answered the Complaint and filed a cross-petition to vacate the JGC Awards on the grounds that there was no CBA or other agreement between Local 150 and Barrington following Sinnett I's termination of the MOA. (Dkt. 45). In a motion to dismiss, Local 150 argued that Barrington waived its objections to the JGC awards by failing to raise them within 90 days of the decisions. (Dkt. 51). On March 13, 2025, the Court denied Local 150's motion. (Dkt. 74). The Court held that, since Barrington was not named in any of the grievances or awards, Barrington could not have been on notice to vacate them unless it was a successor-in-liability to Sinnett Excavating. (*Id.* at 6-7). It recognized that whether a non-signatory such as Barrington is party to a CBA is a factual question for courts and held that the Court could

[5] The parties dispute whether Sinnett I received the JGC Awards. Since the Court does not reach the statute of limitations issue, to which notice is relevant, it need not address this factual dispute.

not resolve the successor-liability dispute at the pleading stage. (*Id.* at 7-9).

On April 22, 2025, Palka emailed Simrayh and informed him of the Court's March 2025 order, stating that Local 150's motion to dismiss was denied "essentially because the JGC did not name Barrington Excavating in its awards." (Dkt. 121-10 at 127). He further wrote: "Because of that decision, I request that this matter be added to the upcoming May 7th 2025 meeting and that the JGC consider issuing a supplemental award to clarify its original awards in grievances No. 23-3-003, No. 23-3-006, and No. 23-3-057 regarding their applicability to Barrington Excavating." (*Id.*). No new grievance was filed against Barrington. (Dkt. 136-1 ¶ 34).

Simrayh did not bring the matter to the JGC, nor did the JGC schedule a hearing to discuss it. (Dkt. 123 ¶¶ 67, 73); (Ex. 7, Dkt. 123, Tr. 94:11-13). Instead, Simrayh and JGC Management Chairman Michael Wysocki had an "informal discussion" on May 7, 2025 about issuing a "clarification" of the earlier JGC decisions. (Dkt. 123 ¶¶ 69, 72, 75); (Ex. 7, Dkt. 123, Tr. 88:11-14, 92:13-18). They wanted to clarify that "Sinnett and Barrington are one and the same." (Ex. 7, Dkt. 123, Tr. 92:18-20). They did not notify Sinnett Excavating or Barrington about the meeting. (*Id.* at 91:24-15); (Dkt. 136-1 ¶ 34). Simrayh testified that he understood that the Court had requested "clarification or [it] couldn't rule," which is why he believed JGC had grounds to issue a supplemental decision. (Ex. 7, Dkt. 123, Tr. 91:1-15).

On May 14, 2025, the JGC sent three "Supplemental Decision[s]" and accompanying letters to Sinnett II. (Dkt. 121-10 at 129-141). The decisions are dated May 7, 2025. (*Id.* at 134, 137, 140). Each Supplemental Decision states:

> In light of Judge Kendall's decision issued on March 13, 2025, in connection with *International Union of Operating Engineers, Local 150, AFL-CIO v. Barrington Excavating, LLC f/k/a Sinnett Excavating, Inc.,* Case No. 1:23-cv-15257, the Committee states that based upon the evidence presented at the [June 7, 2023 or February 7, 2024] hearing, the two companies are the same and the Committee always intended to bind Barrington Excavating, LLC to its [decision on the

grievance].

(*Id.* at 134, 137, 140). They further state that "The Employer, which until May 2021 was known as Sinnett Excavating, Inc., and has since then conducted business as Barrington Excavating, LLC, is party to a current valid Collective Bargaining Agreement with the 1.U.O.E. Local 150." (*Id.*). They each find that Barrington violated the CBA and order Barrington to pay the fines set in the original JGC Awards. (*Id.*). The decisions do not state that Barrington is a successor-in-liability to or alter ego of Sinnett Excavating, nor do they discuss Sinnett Excavating's termination of the MOA. (*Id.* at 134, 137, 140).

On June 4, 2025, Barrington filed an Amended Cross-Petition, asking the Court to vacate the JGC's decisions on Grievances 23-3-003, 23-3-006, and 23-3-057 and the three Supplemental Decisions. (Dkt. 87). Barrington contends that, because Sinnett Excavating terminated the MOA with Local 150 and Barrington has no agreement with Local 150, Local 150 has no contractual authority over it. (*Id.* at 7-30). Additionally, Barrington claims that the monetary award for Grievance 23-3-003 exceeds the damages limit set forth in the CBA. (*Id.* ¶ 32). It also argues that the Supplemental Decisions are unenforceable because they were not made according to the CBA or the JGC Procedural Rules. (*Id.* at ¶¶ 70-77). The parties filed cross-motions for summary judgment on Local 150's Complaint and Barrington's Amended Cross-Petition. (Dkt. 118); (Dkt. 122).

**<u>LEGAL STANDARD</u>**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g., Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). A material fact is genuinely disputed when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). At this stage, the Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Summary judgment should be denied when "a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted[.]" *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016).

Where parties file cross-motions for summary judgment, the standard of decision does not change. *Selective Ins. Co. of S.C. v. Target Corp.*, 845 F.3d 263, 265 (7th Cir. 2016), *as amended* (Jan. 25, 2017). The Court must "tak[e] the facts in the light most favorable to the non-movant, first for one side and then for the other." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Loc. Union 150, AFL-CIO*, 335 F.3d 643, 648 (7th Cir. 2003).

## DISCUSSION

Section 301 of the Labor Management Relations Act ("LMRA") provides federal courts jurisdiction to enforce or vacate arbitration awards issued pursuant to a CBA. *See Merryman Excavation, Inc. v. Int'l Union of Operating Eng'rs, Loc. 150*, 639 F.3d 286, 290 (7th Cir. 2011); *see also Unite Here Local 1 v. Hyatt Corp.*, 862 F.3d 588, 595 (7th Cir. 2017) (citing *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 595–96 (1960)). While joint committees like the JGC are not "genuine arbitration" panels, courts treat their awards as arbitration awards for most purposes. *See William Charles Constr. Co., LLC v. Teamsters Loc. Union 627*, 827 F.3d 672, 678 (7th Cir. 2016); *Merryman*, 639 F.3d at 290. Accordingly, the Court applies arbitration case law and principles in its analysis. *See Part-Time Fac. Ass'n at Columbia Coll. Chicago v. Columbia Coll. Chicago*, 892 F.3d 860, 864, n. 3 (7th Cir. 2018) (recognizing that "arbitration under the LMRA and the FAA are generally subject to the same governing

principles"); *Constr. & Gen. Laborers' Dist. Council of Chicago & Vicinity v. Glob. Builders & Devs. Inc.*, 2025 WL 3485764, at *3 (N.D. Ill. Dec. 4, 2025) (applying arbitration law in analysis of a JGC award).

Courts are highly deferential to joint grievance committees' rulings on the merits of a claim. *See Ganton Techs., Inc. v. UAW, Local 627*, 358 F.3d 459, 462 (7th Cir. 2004); *Ameren Ill. Co. v. Int'l Bhd. of Elec. Workers, Loc. Union 51*, 906 F.3d 612, 616 (7th Cir. 2018) ("A court's role in reviewing a labor arbitration award is very limited.") (internal citation omitted). Yet this deference only applies when the parties have a CBA that provides a grievance committee with power to resolve disputes. *Merryman*, 639 F.3d at 289 ("As long as the parties agreed that [a grievance's committee's procedures and determinations] would be binding, it is not open to the courts to reweigh the merits of the grievance.") (citing *General Drivers, Warehousemen and Helpers, Local 89 v. Riss & Co.,* 372 U.S. 517, 519 (1963)). Courts retain authority to determine "whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator power to make the award he made." *United Steelworkers* v. *Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960).

Barrington argues that the JGC Awards and Supplemental Decisions must be vacated because (1) it never entered into an agreement with Local 150 and (2) it cannot be bound by Sinnett Excavating's MOA with Local 150 because the MOA was validly terminated. (Dkt. 122 at 7-20). Accordingly, Barrington contends that it had no obligations to Local 150 and that the JGC lacked authority to issue or enforce awards against it. (*Id.*). Barrington also argues that the original JGC Awards and Supplemental Decisions were untimely under the LMRA and procedurally defective, providing additional grounds for vacatur. (*Id.* at 20-25).

Local 150 argues that Barrington is time-barred from contesting the validity of the MOA,

CBA, or JGC decisions because it failed to seek vacatur within the 90-day statute of limitations. (Dkt. 119 at 17-14). Although it acknowledges that Barrington was neither a signatory to any agreement nor named in the original JGC Awards, Local 150 contends that Barrington had notice of the Awards as Sinnett Excavating's successor or alter ego. (Dkt. 136 at 13-23). Additionally, Local 150 asserts that the original JGC Awards effectively treated Barrington and Sinnett Excavating as the same entity, and the supplemental decisions merely clarified that Barrington was intended to be bound by those Awards. (*Id.* at 22-24). Local 150 therefore argues that the Court must defer to the JGC's determinations. (*Id.*). Local 150 also contends that Sinnett Excavating did not validly terminate the MOA. (Dkt. 134 at 10-15).

While the parties raise numerous issues concerning the JGC Awards and Supplemental Decisions, each turns on two threshold questions: whether Barrington was bound to any agreement with Local 150 and who has the authority to determine that.

## I. Statute of Limitations

The Court addresses Local 150's statute-of-limitations defense at the outset only to explain why it does not preclude consideration of the threshold question of whether Barrington was subject to an agreement with Local 150. Because the Court concludes that Barrington has no agreement with Local 150, the Court ultimately need not decide whether Barrington's challenge to the JGC Awards is otherwise time-barred.

Local 150 argues that Barrington may not challenge the JGC Awards because it failed to do so within 90 days of their issuance. (Dkt. 119 at 13-14). There is a 90-day statute of limitations for challenges to arbitration awards. *Sullivan v. Lemoncello,* 36 F.3d 676, 681 (7th Cir. 1994); 710 ILCS 5/12(b). In most cases, the rule is "simple": "If you receive notice of an adverse decision in a federal labor arbitration, challenge it within 90 days or expect to pay up." *Int'l Union of*

*Operating Eng'rs, Loc. 150 v. Rabine*, 161 F.3d 427, 434 (7th Cir. 1998). But the statute of limitations defense presupposes that the party seeking vacatur was subject to an arbitration agreement in the first place.

Arbitration is "a matter of contract and a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 314 (2010) (citing *Steelworkers,* 363 U.S. at 582). Consistent with this principle, "an arbitration agreement generally cannot bind a non-signatory." *Coatney v. Ancestry.com DNA, LLC*, 93 F.4th 1014, 1019 (7th Cir. 2024) (internal citation omitted). The Court already addressed the interplay between these principles and the statute of limitations in its second dismissal order. (Dkt. 74 at 6-9). Because Barrington was not a signatory to any agreement with Local 150, was not named in the JGC Awards, and did not participate in the grievance proceedings, the Court held that it could not reach Local 150's limitations defense until it determined whether Barrington had any contractual obligations to Local 150 in the first place. (*Id.*) (citing *Rabine*, 161 F.3d at 432 and *Illinois Dist. Council No. 1 of Int'l Union of Bricklayers & Allied Craftworkers, AFL-CIO v. Christoffer*, 2006 WL 2583724, at *2 (N.D. Ill. Sept. 5, 2006)).

Since it remains undisputed that Barrington was not a signatory to any agreement with Local 150 or a party to the JGC proceedings, the Court's prior holding remains applicable at this stage: the Court must first determine whether Barrington is bound by any agreement with Local 150 before addressing any impact of the 90-day limitations period. That conclusion raises the threshold question of who has authority to make that determination.

## II. Gateway Arbitrability

Local 150 argues that the Court need not independently determine whether Barrington was bound by the MOA and CBA because the JGC already resolved that issue. (Dkt 119 at 22-24). To

the extent this is not explicit in the JGC Awards, Local 150 asserts that the Supplemental Decisions clarify that Barrington and Local 150 are the same company, Barrington is a party to the CBA, and Barrington is bound by the original Awards. (Dkt. 121-10 at 129-141). Local 150 contends that these findings are owed deference by the Court. (*Id.*).

Local 150's argument assumes that the JGC possessed the authority to determine whether Barrington, a non-signatory, was bound by the MOA and CBA in the first instance. But the Court already held that whether Barrington is bound by the CBA is a question for the Court, not the JGC, to decide. (Dkt. 74 at 7) (citing *Workers Int'l Ass'n Local Union No. 1 v. Grimm Heating & Air Conditioning, Inc.*, 2013 WL 12241281, at *2 (C.D. Ill. July 11, 2013)). Contrary to Local 150's suggestion, the Court neither invited nor required the JGC to supplement its original Awards. (*Id.*). Rather, it recognized that the original Awards did not resolve Barrington's liability and expressly reserved that determination for the Court after the parties had developed the factual record. (Dkt. 74 at 7-9).

The Court reaffirms the principles that establish why this threshold issue is one for judicial determination. Typically, courts must decide gateway issues of arbitrability unless the parties have agreed otherwise. *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649, (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."). The CBA states that the JGC has authority to "decide questions of both procedural and substantive arbitrability." (Dkt. 123-6 at 41-42). Yet, the issue of whether the parties formed a contract or agreement cannot be delegated to an arbitrator. *See Granite Rock*, 561 U.S. at 296 (2010) ("[W]here the dispute at issue concerns contract formation, the dispute is generally for courts to decide."); *K.F.C. v. Snap Inc.*, 29 F.4th 835, 837 (7th Cir. 2022) ("Even the most sweeping delegation cannot send the contract-

formation issue to the arbitrator, because, until the court rules that a contract exists, there is simply no agreement to arbitrate.”).

Accordingly, regardless of the language in the CBA, the Court must decide whether Barrington, which was not named in the original JGC Awards and did not sign the MOA or CBA, is bound by either agreement. *See, e.g., Teamsters Loc. Union No. 705 v. L. Neill Cartage Co.*, 2021 WL 4477888, at *6 (N.D. Ill. Sept. 30, 2021) (holding that whether a grievance panel’s award could be enforced against a party who did not sign a CBA is a question for the district court); *Coatney v. Ancestry.com DNA, LLC*, 2022 WL 4602653, at *6 (S.D. Ill. Sept. 30, 2022), *aff’d*, 93 F.4th 1014 (7th Cir. 2024) (holding, in the commercial arbitration context, that the Court must decide whether a non-signatory is bound by an arbitration provision regardless of a clause delegating gateway issues to an arbitrator); *CCC Info. Servs. Inc. v. Tractable Inc.*, 2019 WL 2011092, at *2 (N.D. Ill. May 7, 2019), *aff’d sub nom. CCC Intelligent Sols. Inc. v. Tractable Inc.*, 36 F.4th 721 (7th Cir. 2022) (same).

Since this is a gateway issue of arbitrability reserved for judicial determination, the JGC lacked authority to resolve that question in the Supplemental Decisions. Accordingly, the Court vacates the Supplemental Decisions as invalid. *See United States Soccer Fed’n, Inc. v. United States Nat’l Soccer Team Players Ass’n*, 838 F.3d 826, 832 (7th Cir. 2016) (“[T]he court is empowered to vacate an arbitrator’s award if the arbitrator had exceeded the powers delegated to him by the parties.”) (internal citation omitted); *AGCO Corp. v. Anglin*, 216 F.3d 589, 596 (7th Cir. 2000) (ordering lower court to vacate arbitration award on remand where the arbitrators exceeded their authority by arbitrating a non-signatory’s obligations to a signatory).

## III. Enforceability of JGC Awards

Having determined that this is an issue for judicial resolution, the Court turns to the

question of whether Barrington is subject to any agreement with Local 150 such that the JGC Awards may be enforced against it. Since there is no factual dispute that Sinnett Excavating terminated the MOA, there is no agreement with Local 150 to which Barrington can be bound. Accordingly, Barrington is entitled to partial summary judgment.

Local 150 argues that the JGC Awards naming Sinnett Excavating can be imposed on Barrington under the successorship or alter ego liability doctrines. (Dkt. 119 at 14-22); (Dkt. 134 at 3-4); (Dkt. 138 at 3-4). Under both doctrines, arbitration awards imposed on a former company may be enforced against a new one if certain conditions are met. *See Int'l Union of Operating Eng'rs, Loc. 150, AFL-CIO v. Centor Contractors, Inc.*, 831 F.2d 1309, 1313 (7th Cir. 1987) (holding that the successor liability and alter ego doctrines are applicable to the enforcement of arbitration awards that are part of the collective bargaining process); *Neill Cartage*, 2021 WL 4477888, at *5 (describing the doctrines as "means of binding nonsignatories to arbitration agreements") (internal citations omitted). Successor liability "can be used to hold one entity responsible for the obligations of another when there are sufficient indicia of continuity between the two entities and the alleged successor has notice of the predecessor's liability." *E. Cent. Illinois Pipe Trades Health & Welfare Fund v. Prather Plumbing & Heating, Inc.*, 3 F.4th 954, 956 (7th Cir. 2021). Similarly, if an entity dissolved with a fraudulent intent to avoid collective bargaining obligations and the successor company is sufficiently similar, the successor "will be held to the terms of the full collective bargaining agreement entered by the predecessor." *McCleskey v. CWG Plastering, LLC*, 897 F.3d 899, 903 (7th Cir. 2018).

Local 150 invokes these principles to place Barrington in Sinnett Excavating's shoes, but the parties' extensive disputes over successor and alter ego liability overlook a dispositive question that comes first: whether Sinnett Excavating validly terminated the MOA before Barrington began

operations. If Sinnett Excavating terminated the MOA before Sinnett II opened Barrington, no operative agreement remained for Barrington to inherit, regardless of whether Barrington otherwise would qualify as Sinnett Excavating's successor or alter ego. *See, e.g. Midwest Operating Eng'rs Welfare Fund v. J & L Excavating, Inc.*, 2020 WL 3469170, at *4 (N.D. Ill. June 25, 2020), *dismissed*, 2021 WL 3160875 (7th Cir. Feb. 25, 2021) (declining to reach union's successorship argument after holding that, following the termination of an MOA, there was no operative agreement to which the employer could be a successor); *Bd. of Trs. of Rockford Pipe Trades Indus. Pension Fund v. Kerby Plumbing, Inc.*, 2009 WL 10692477, at *4 (N.D. Ill. Oct. 22, 2009) (recognizing that, had the predecessor entity properly terminated the collective bargaining agreement before the new entity began operations, the new entity could not have been bound as a successor). Accordingly, the Court turns to the termination of the MOA.

**A. Termination of the MOA**

Although the JGC Awards determined that Sinnett Excavating was a party to the current version of the CBA and that the CBA was in "full effect," the Awards did not address the validity of Sinnett Excavating's February 2021 letter terminating the MOA and withdrawing from subsequent CBAs. (Ex. 20, Dkt. 125-8). Local 150 does not contend otherwise. (*See generally* Dkts. 119, 134, 138). Instead, Local 150 argues for the first time that the termination was infective because Sinnett Excavating purportedly acted in bad faith by misrepresenting that it was going out of business. (Dkt. 134 at 10-13). The Court therefore does not revisit any determination made by the JGC. It addresses the separate question of whether Sinnett Excavating validly terminated the MOA before Barrington began operations in order to determine whether Barrington had any agreement with Local 150 to arbitrate.

It is well-established that "contractual obligations will cease, in the ordinary course, upon

termination of the bargaining agreement." *CNH Indus. N.V. v. Reese*, 583 U.S. 133, 135 (2018) (citing *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 441-42 (2015)). Barrington asserts that the MOA between Sinnett Excavating and Local 150 was terminated pursuant to the agreement's termination clause, negating any obligations Barrington could have under that agreement, and thus, under any CBA adopted by the MOA. (Dkt. 122 at 15-20); (Dkt. 140 at 4-5).

The MOA between Sinnett Excavating and Local 150 contained a clause providing that the agreement would continue in effect and adopt any subsequent CBA until either Sinnett Excavating or Local 150 terminated it. (Ex. 15, Dkt. 125-3 at 5). A memorandum of agreement containing this type of "evergreen clause" provides for the automatic renewal of the agreement and binds an employer to subsequent CBAs until the agreement is properly and timely terminated. *See Masonry Inst. v. Est. of McNeela*, 1995 WL 578187, at *2 (7th Cir. 1995); *Cent. States, Se. & Sw. Areas Pension Fund v. Transervice Logistics, Inc.*, 56 F.4th 516, 522 (7th Cir. 2022). Courts interpret collective bargaining agreements according to ordinary principles of contract law. *Tackett*, 574 U.S. at 435. Following these principles, the terms of a collective bargaining agreement, including an evergreen clause, "are to be enforced strictly when the terms are unambiguous." *Contempo Design, Inc. v. Chicago & Northeast Illinois District Council of Carpenters*, 226 F.3d 535, 546 (7th Cir. 2000). This guidance applies the same when the clause is contained in an agreement, like an MOA, that adopts a CBA. *See Masonry,* 1995 WL 578187 at *2.

Barrington argues that Sinnet I terminated the MOA when he sent a letter to Local 150 on February 5, 2021. (Dkt. 122 at 18-19). The MOA states that the agreement and the adoption of the CBA shall "remain in effect to and including the expiration date of the CBA" and "continue in effect from year to year thereafter. . .unless notice of termination or amendment is given in the manner provided therein." (Ex. 15, Dkt. 125-3 at 5). It further provides that "[e]ither party desiring

to amend or terminate this [Agreement] must notify the other in writing at least three (3) calendar moths prior to the expiration of the [CBA] adopted herein." (*Id.*). This evergreen clause is unambiguous, so the Court must enforce its terms. *See Anderson v. Liles*, 2011 WL 3273132, at *5 (N.D. Ill. July 29, 2011).

On February 5, 2021, Sinnet I mailed a letter to Local 150 informing it that, as of May 30, 2021, he would be retiring and closing Sinnett Excavating. (Ex. 8, Dkt. 123-7). He further stated:

> Pursuant to paragraph 5 of the 1995 Memorandum of Agreement between Sinnett Excavating, Inc. and [Local 150], please accept this correspondence as notice of termination of the Memorandum of Agreement between [Local 150] and Sinnett Excavating, Inc., effective May 31, 2021, and notice of Sinnett Excavating, Inc's withdrawal from further participation in the [CBA], upon its termination on May 31, 2021.

(*Id.*). To determine whether Sinnett I's letter effectively terminated the MOA, the Court must (1) "look to the language of the evergreen clause establishing the method of termination" and (2) "analyze whether the alleged notice complied." *Transervice,* 56 F.4th at 522. Additionally, for the notice to be valid, Sinnett Excavating's intent to terminate must have been clear and unequivocal. *See Cent. States, Se. & Sw. Areas Pension Fund v. Depew Dev., Inc.*, 172 F.3d 52 (7th Cir. 1998). This letter complies with the notice requirements of the MOA's evergreen clause: Sinnett I sent a notice in writing and well within three months of CBA I's expiration date of May 31, 2021.

Additionally, the letter is unambiguous as to Sinnett I's intent to terminate the MOA. The letter explicitly provides that it is a "notice of termination" of the MOA and a notice of Sinnett Excavating's withdrawal from the CBA after its expiration. (Ex. 8, Dkt. 123-7). This language is similar to language the Seventh Circuit deemed sufficient to terminate a collective bargaining agreement in *Rutherford v. Judge & Dolph Ltd.*, 707 F.3d 710, 716 (7th Cir. 2013). There, the union served a notice on the employer stating that it was a "notice to. . .terminate" and that the union "d[id] not want to continue or extend the current CBA" beyond its expiration date. *Id.* at 716-717.

Since this notice of termination was sufficiently clear, the Court held that the employer did not breach the CBA because it was no longer in effect. *Id.* Similarly, here, the Court "cannot imagine a notice of desire to cancel or terminate the [MOA] that is any more clear." *Id.* at 716 (internal quotation omitted).

Other courts have found termination notices sufficiently clear even without language as explicit as what Sinnett I used. For instance, in *Cent. States, Se. & Sw. Areas Pension Fund v. Univar Sols. USA Inc.*, the parties had a collective bargaining agreement with an evergreen clause requiring either party to provide written notice of its desire to cancel or terminate the agreement within 60 days of its expiration. 148 F.4th 426, 428 (7th Cir. 2025). It also provided a mechanism by which parties could modify the agreement if they wanted to continue it. *Id.* at 428-29. Within the proscribed period, the employer sent a letter to the fund "proposing the modification or termination" of the CBA and asking to negotiate a successor agreement. *Id.* at 429. Reading the evergreen clause and modifications clause together, the Court held that the letter sufficiently terminated the CBA because the employer did not express an intention to continue the CBA. *Id.* at 432.

Additionally, in *J & L Excavating*, the court held that JGC awards could not be enforced against an entity under the successor liability doctrine because the predecessor company had terminated its MOA with a pension fund before the new entity was formed. 2020 WL 3469170, at *3-5. The court determined that a letter stating that the predecessor employer would "no longer be effective or conducting business" effectively terminated an MOA with an evergreen clause identical to the one here. 2020 WL 3469170, at *2, 4-5. The court reasoned that "the only reasonable reading" of the letter was an intent to terminate, particularly because the fund understood it as a termination when it received the letter. *Id.* at *5. Here, Local 150 does not dispute

the clarity of Sinnett I's notice. Its response confirms that it understood the notice as a termination, informing Sinnett I that he did not need to negotiate a new agreement or honor a successor CBA because he was retiring and going out of business. (Ex. 9, Dkt. 123-8). Against this backdrop, Sinnett I's notice, which is more explicit than the notices upheld in *Univar Solutions* and *J & L Excavating*, unambiguously communicated Sinnett Excavating's intent to terminate the MOA.

Indeed, Local 150 does not dispute the validity or effect of the MOA's evergreen clause. Nor does it dispute that Sinnett Excavating timely provided an unambiguous notice of termination. Its challenge instead concerns the effectiveness of the notice: whether Sinnett Excavating genuinely intended to cease operations and, if not, whether its allegedly false representation of that intent renders the termination ineffective. (Dkt. 134 at 10-13).

First, Local 150 claims that the Sinnett I's letter was not an effective notice of termination because, according to Local 150, the opening of Barrington indicates that the stated reasons for Sinnett Excavating's termination—its closure and Sinnett I's retirement—were false. (Dkt. 134 at 10-11). But the validity of those stated reasons is immaterial because the MOA did not require a terminating party to provide any reason for termination or limit the grounds on which it could terminate. (Dkt. 123 23); *see L.A.P.D., Inc. v. General Elec. Corp.*, 132 F.3d 432, 404 (7th Cir. 1997) (where a contract permits termination for any reason, or no reason, the terminating party need not disclose its reasons). The evergreen clause required only "notice of termination" within three months of the CBA's expiration. (Ex. 15, Dkt. 125-3 at 5). As discussed above, Sinnett I's letter unequivocally provided that notice and expressed a clear intent to terminate the MOA. The Court therefore need not consider whether Sinnett I's stated reasons were accurate or genuine. *See Transervice*, 56 F.4th at 530-31 (where a termination notice is unambiguous, courts do not consider extrinsic evidence to interpret it).

Local 150's bad faith argument is equally unavailing. Local 150 asserts that, contrary to Sinnett I's statements in the letter, Sinnett Excavating did not go out of business but instead continued operating under the Barrington name. (Dkt. 134 at 10). It therefore characterizes the letter as a "fraudulent misrepresentation" and "false going-out-of-business letter" that violates the covenant of good faith and fair dealing and did not effectively terminate the MOA. (*Id.* at 11–12).

In substance, this is an assertion that Sinnett Excavating terminated the contract in bad faith, which is a breach of contract claim. *See Manley v. Boat/U.S., Inc.*, 370 F. Supp. 3d 892, 903 (N.D. Ill. 2019) (construing allegations that company terminated a contract in bad faith as a breach-of-contract claim); *Tekway Inc. v. AT&T Servs., Inc.*, 2021 WL 2333018, at *2 (N.D. Ill. June 8, 2021) (same). Section 301 of LMRA provides federal jurisdiction over for breach of collective bargaining agreements. *Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1503 (7th Cir. 1991) (recognizing that Section 301 of the LMRA "creates federal jurisdiction over suits to enforce labor contracts"); *Merryman*, 639 F.3d at 290 (holding that a "breach of a federal labor contract" is subject to Section 301 jurisdiction). But Local 150 did not plead such a claim. Its Complaint alleges that Barrington breached the CBA by failing to comply with the JGC Awards. (Dkt. 1). It raises its theory that Sinnett Excavating terminated the MOA in bad faith for the first time in opposition to summary judgment. (Dkt. 134 at 10-13). New claims cannot be added in response to a summary judgment motion. *Anderson v. Donahoe,* 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.") (internal citation omitted). Accordingly, the Court need not address these contentions.

In sum, Local 150 has failed to dispute the validity of Sinnett Excavating's termination notice. Since Sinnett I's February 5, 2021 letter followed the termination procedures set forth in

the MOA's evergreen clause and clearly expressed an intent to terminate, the Court finds that Sinnett Excavating terminated the MOA with Local 150[6]. *C.f. Transervice*, 56 F.4th at 529 (a union's letter did not meet an evergreen clause's requirements for termination because it expressed a desire to renegotiate but did not "clearly express an intent to terminate"); *Contempo*, 226 F.3d at 546 (a CBA's automatic renewal provision went into effect where it was undisputed that neither the union nor the employer provided timely notice of a desire to terminate the agreement); *Crandell*, 655 F. Supp. at 722 (an employer's letter did not constitute a notice of termination of a CBA because the employer did not follow the "essential termination procedures" within the agreement) (internal citation omitted).

While Local 150 devoted substantial attention to establishing that Barrington is a successor or alter ego of Sinnett Excavating, its arguments overlook a more fundamental problem: the MOA to which it seeks to bind Barrington had already been terminated before Local 150 negotiated a new CBA with MARBA and before Barrington began operations. This is not the first time Local 150 has overlooked the contractual status of the entity against which it seeks to enforce a labor agreement. In *Rabine*, the Seventh Circuit observed that Local 150 appeared to have been "careless in its assumptions" about the entity with which it was dealing and, citing *Sinnett Excavating*, 1995 WL 23040, declined to enforce arbitration awards against an entity that was neither a party to the CBA nor before the arbitrator. 161 F.3d at 433-34.

Here, Local 150 again proceeded on the assumption that one entity could be held to another

---

[6] Barrington also contends that Sinnett Excavating was entitled to revoke the CBA under Section 8(f) of the LMRA. (Dkt. 122 at 12-15). In light of the Court's conclusion that the MOA was effectively terminated pursuant to a valid evergreen clause, those arguments need not be addressed. *See J & L Excavating*, 2020 WL 34691740 at *4 n.3 (declining to reach defendant's arguments regarding termination of an MOA under the "one-man-unit" rule after concluding that the MOA was terminated through an evergreen clause); *Vulcan Const. Materials, L.P. v. Int'l Union of Operating Eng'rs*, 2009 WL 5251889, at *8 (N.D. Ill. Nov. 25, 2009) (considering whether plaintiff repudiated its MOA with a union under Section 8(f) after concluding that it failed to effectively terminate the MOA pursuant to an evergreen clause).

entity's contractual obligations without first accounting for a threshold contractual defect: Sinnett Excavating had terminated the MOA before Barrington began operations. Whether this was strategic or inadvertent, it is dispositive. Because no operative agreement remained for Barrington to inherit, Barrington cannot be bound to the MOA as a successor or alter ego. *See J & L Excavating*, 2020 WL 3469170, at *5. The Court therefore need not reach the parties' successorship arguments.

## IV. Enforceability and Vacatur of the JGC Decisions

Since Sinnett Excavating validly terminated the MOA before Barrington began operations, Barrington was not subject to any agreement with Local 150 and therefore was not obligated to arbitrate grievances or comply with the JGC Awards. Thus, the JGC Awards cannot be enforced against Barrington. *See J & L Excavating*, 2020 WL 3469170, at *5 (declining to enforce JGC awards against non-signatory entity where predecessor company had terminated agreement with pension fund); *Int'l Union of Operating Eng'rs, Loc. 150, AFL-CIO v. Sam J. Chellino Crane Rental, Inc.*, 2010 WL 3731627, at *10 (N.D. Ill. Sept. 20, 2010) (holding that an arbitration award was unenforceable because it was issued under an inapplicable collective bargaining agreement); *Curcuro v. Gronemann Pizza, Inc.*, 2026 WL 800629, at *1 (N.D. Ill. Mar. 23, 2026) (recognizing that a court cannot confirm an arbitration award if an agreement to arbitrate does not exist). The Court makes no findings as to whether the Awards should be vacated or otherwise set aside as to Sinnett Excavating or any other entity.

Additionally, as discussed above, the Supplemental Decisions are vacated because the JGC exceeded its authority by purporting to resolve the threshold question of whether Barrington was subject to the MOA or CBA. These conclusions resolve the dispute, and the Court therefore does not reach the parties' remaining arguments concerning the validity of the JGC's procedures, the

timeliness of Local 150's grievances, or the timeliness of Barrington's challenges to the JGC Awards. Local 150's Motion for Summary judgment seeking to enforce the JGC Awards against Barrington is therefore denied. Barrington's Motion for Summary Judgment seeking vacatur of the JGC Awards and Supplemental Decisions is granted in part and denied in part.

**CONCLUSION**

For the foregoing reasons, the Court denies Local 150's Motion for Summary Judgment [118] and grants Barrington's Motion for Summary Judgment [122].

Virginia M. Kendall

Date: September 18, 2026